**Not for publication**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                        :
JASON WILLIAMS,                         :
                                        :
                    Plaintiff,          :        Civil Action No. 08-4557 (JAP)
        v.                              :
                                        :        **OPINION**
COMMISSIONER OF SOCIAL                  :
SECURITY,                               :
                    Defendant.          :
_____ :

PISANO, District Judge:

Before the Court is Plaintiff Jason Williams's appeal from the Commissioner of the

Social Security Administration's ("Commissioner") final decision denying his request for

Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  The Court has

jurisdiction to review this matter under 42 U.S.C. § 405(g) and decides this matter without oral

argument, _see_ Fed R. Civ. P. 78.  The record provides substantial evidence supporting the ALJ's

decision that Plaintiff retains the residual functional capacity to perform unskilled light exertion

work; however, the Commissioner has not established that there are jobs that exist in significant

numbers in the national economy that the Plaintiff can perform.   Accordingly, the Court affirms

in part and remands this matter to the Administrative Law Judge ("ALJ") for further findings

consistent with this opinion.

## I.      BACKGROUND

Plaintiff was born on March 19, 1974, and at the time of his hearing before the ALJ was

32 years old.  Administrative Record ("R.") at 20; 462.  He is a college graduate and is

approximately one academic year away from completing a master's degree. _Id_. at 21; 461.  His

past relevant work history is as a financial consultant and clerical administrator.  *Id*. at 453; 459.
According to Plaintiff, his last "important job" ended in 2002.  *Id*. at 453.  Plaintiff alleges
disability beginning on June 12, 2002.  *Id*. at 14.

## II.    PROCEDURAL HISTORY

Plaintiff filed an application for DIB and SSI on November 25, 2003, alleging an inability
to work since June 12, 2002 due to a severe and disabling medically determinable impairment.[1]
*Id*. at 14.  The Social Security Administration ("SSA") denied Plaintiff's claim initially and upon
reconsideration.  R. at 14.  On January 23, 2007, a hearing was held before Administrative Law
Judge Daniel L. Rubine in Elkins Park, Pennsylvania.  *Id.* at 448.  The ALJ issued a written
decision denying Plaintiff's claim on March 22, 2007.  *Id.* at 14-22.

## III.   FACTUAL HISTORY

### A.    Plaintiff's Previous Employment

Plaintiff's past relevant work experience includes various clerical, administrative, and
consulting positions.  Plaintiff testified that his last "important job" was with Price Waterhouse
as a financial consultant.  *Id.* at 452-453.  According to Plaintiff, he was employed by Price
Waterhouse as a financial consultant for approximately three years ending in 2002, and his job
duties included performing accounting and internal corporate auditing for Viacom, MTV, and
VH1.  *Id.* at 453; 458.  Prior to 2002, Plaintiff also worked in various temporary positions for
Selective Staffing, Adeco, and Palmerans Outsourcing doing clerical administrative work.  *Id*. at
458-59.  He also worked for Payne Webber selling packaged funds to high net worth clients.  R.
at 460.  While in college, Plaintiff worked for UPS entering tariff classifications for imports into
the United States.  *Id*. at 459.  He also performed clerical work for the Society of Naval

---

[1] Plaintiff suffers from post-traumatic stress disorder and human immunodeficiency virus.

Architects.  *Id*. at 460.  Most recently, in the summer of 2006, Plaintiff was employed by the YMCA checking people in at the front desk.  *Id.* at 453; 456.  Plaintiff testified that he was asked to leave his position at the YMCA because he was no longer needed.  *Id.* at 455.

### B.    Plaintiff's Daily Activities

At the time of the hearing, Plaintiff testified that he lives with his aunt.  *Id.* at 468.  Plaintiff's aunt does the housework, as well as the cooking and the laundry.  R. at 468-69.  Plaintiff attempts to help with the housework by straightening up a little bit but claims that his weakness limits how much he can accomplish.  *Id*. at 470.  Plaintiff testified that he sleeps approximately nineteen hours a day.  *Id*.  During his waking hours, Plaintiff tries to do a little bit of exercise, rests, reads the newspaper and magazines, and reads about his conditions.  *Id*. at 470; 472-73.  Plaintiff claims that he suffers from nightmares and night sweats that prevent him from sleeping through the night.  *Id*. at 471.  Plaintiff testified that he has not driven for three or four years.  *Id*. at 466.  He does not go to the store because he does not like to be around people.  R. at 469.  His aunt drives him to the doctor.  *Id.* at 469-70.  Plaintiff does not take the bus because he is afraid of germs.  *Id.*  Plaintiff's cousin takes him for a drive once or twice a week to Wawa.  *Id.*at 470.  Plaintiff also attends church two or three times a week.  *Id.* at 302.

### C.    Plaintiff's Medical History

Plaintiff suffers from post-traumatic stress disorder ("PTSD") and human immunodeficiency virus ("HIV").  *Id.* at 16.  Plaintiff has suffered from PTSD since at least 2002.  R. at 14.  He developed the condition as a result of witnessing his father murder his mother in 1981.  *Id.* at 299; 464.  In 2003, Plaintiff's father was charged with the murder and brought to trial.  *Id.* at 465.  The stress caused by his father's trial exacerbated Plaintiff's PTSD.  *Id.*

3

In 2002, Plaintiff was shot through the chest and right arm in an apparent drive-by shooting. *Id*. at 465-69. Plaintiff believes he was shot by his father's associates to keep him from testifying at the murder trial. *Id*. Plaintiff received treatment at the Capital Health System Emergency Department. R. at 319-34; 200-07. There is no evidence that the gunshot wound has caused Plaintiff permanent physical injury; however, Plaintiff asserts that it has contributed to his PTSD. *Id*. at 208. On July 9, 2002, Plaintiff was treated at the Capital Health Systems Emergency Department for depression and anxiety with sleep and appetite disturbance stemming from the shooting and from witnessing his mother's murder. *Id*. at 336. Plaintiff was prescribed Zyprexa, Zoloft, and Elavil, and discharged with instructions to follow up for medication monitoring. *Id*. at 341; 343.

Plaintiff received counseling at the Family Growth Program ("FGP") intermittently from September 2002 until March 2004. *Id*. at 208-217. He originally sought counseling to help with the emotional turmoil caused by his mother's murder trial. *Id*. at 208. After the trial, Plaintiff left counseling and attempted to return to the workforce. R. at 208. He returned to counseling at FGP in 2004 because he felt "stuck" in his life. *Id*. Plaintiff had not been able to successfully return to the workforce because he had difficulty concentrating. *Id*. At the time he returned to counseling at FGP, he had begun to stay home as much as possible in order to avoid people. *Id*. He had developed a distrust of everyone, including his relatives. *Id*. The FGP counselor set treatment goals for Plaintiff; however, Plaintiff discontinued therapy before his treatment goals were attained. *Id*. at 209.

On April 24, 2004, Plaintiff was evaluated by Vinobha Gooriah, M.D. for the New Jersey Department of Labor, Division of Disability Determinations Services as part of his application for DIB and SSI. R. at 218. At the time Plaintiff was assessed by Dr. Gooriah, he had

4

unilaterally discontinued all treatment for his PTSD. *Id.* at 219. Dr Gooriah found Plaintiff to be oriented times three. *Id.* Plaintiff's speech was clear, coherent, elaborate, and logical. *Id.* Plaintiff also reported being able to see spiritual things and heal the sick. *Id.* at 220. Dr. Gooriah found that Plaintiff required an in depth psychological evaluation because he reported having hallucinations but was vague when asked to describe them, and because he appeared to suffer from flashbacks of his mother's murder. *Id.* Dr. Gooriah concluded that Plaintiff needed to be in counseling. R. at 220. Dr. Gooriah diagnosed Plaintiff with Axis I: rule out PTSD and alcohol/cannabis abuse; Axis III: status post bullet injury to the right arm and chest; Axis IV: severity of stressors: severe; Axis V: GAF is 51. *Id.*

On May 14, 2004, Jane Curran, Ph.D. conducted a psychological assessment and mental residual functional capacity assessment of Plaintiff. *Id.* at 222-39. Dr. Curran found that Plaintiff was not receiving treatment for his condition and had no psychological treatment plan. *Id.* at 224. She found Plaintiff to be oriented with clear, coherent, and logical speech. *Id.* at 224. Dr. Curran noted that Plaintiff reported having visual hallucinations, and reported being socially withdrawn. *Id.* Plaintiff also reported that he sometimes drives. R. at 224. Dr. Curran found that, while depressed and anxious, Plaintiff was able to understand, remember, and execute simple instructions. *Id.* Dr. Curran also found Plaintiff able to make simple decisions. *Id.* at 222. Dr. Curran noted that Plaintiff was able to respond appropriately to supervisors and co-workers and deal with routine change. *Id.* at 224. Dr. Curran found that Plaintiff's restriction on daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace was moderate. *Id.* at 236. In summary, Dr. Curran found that Plaintiff could "meet the basic mental demands of unskilled work." *Id.* at 224.

Plaintiff sought emergency treatment for his PTSD symptoms twice in January 2005.  R. at 240-77; 307-18.  On January 6, 2005, Plaintiff was treated for personality disorder, suicidal ideation, and microcytic anemia at the Capital Health System Emergency Department.  *Id*. at 307-18.  At the time of his initial evaluation, Plaintiff reported that he had smoked marijuana and wanted to hurt himself.  *Id*. at 308.  Plaintiff was discharged with instructions to follow up with outpatient treatment.  *Id*. at 309.   On January 10, 2005, Plaintiff returned to the Capital Health System Emergency Department complaining of anxiety, nervousness, anger, and depression.  *Id*. at 241.  Plaintiff was prescribed Lexapro, Seroquel, and Vistaril, instructed to follow up for medication monitoring in two weeks, and referred to Catholic Charities for outpatient treatment. *Id*. at 243; 269.  Plaintiff received counseling at Catholic Charities from January 2005 through March 2005, at which time he unilaterally discontinued treatment.  R. at 278-282.

On March 30, 2005, Plaintiff was evaluated by Hugh D. Moore, Ph.D.  *Id.* at 283.  Dr. Moore found Plaintiff defensive and irritable.  *Id*. at 284.  Plaintiff was clean and well groomed, his speech was fluent, and his thought process was coherent.  *Id*. at 285.  He showed no signs of delusions, hallucinations, or disordered thinking.  *Id*. at 285.  Dr. Moore found Plaintiff to be oriented and his concentration was intact.  *Id*. at 285.  However, Dr. Moore found that Plaintiff had poor insight and judgment.  R. at 285.  At the time of the evaluation, Dr. Moore concluded that Plaintiff was able to understand and follow simple instructions, capable of performing simple and complex tasks, maintaining a schedule, learning new tasks, and making appropriate decisions.  *Id*. at 285.  Dr. Moore also concluded that Plaintiff was not able to relate appropriately to other people and did not deal well with stress.  *Id*. at 285.  Dr. Moore diagnosed Plaintiff with Axis I: schizophrenic disorder, paranoid type, PTSD, cannabis abuse, rule out alcohol abuse; Axis II: personality disorder NOS; and Axis III: anemia.  *Id*. at 286.  Dr. Moore

concluded that Plaintiff's prognosis was guarded but his symptoms could be relieved with continued intervention and support.  *Id*. at 285.

Plaintiff received a clinical evaluation at Penndel Mental Health Center in April 2006; he was diagnosed with PTSD, major depressive disorder and cannabis abuse.  *Id*. at 356.  He attended three therapy sessions before unilaterally discontinuing counseling.  R. at 356.  In June 2006, he received a psychiatric evaluation conducted by Fredric M. Mintzer, M.D.  *Id*. at 356-62.  At the time of the evaluation, Plaintiff was taking Zyprexa and Zoloft for his psychological problems.  *Id*. at 356.  Plaintiff reported that he had not worked since 2005 and that he used marijuana daily.  *Id*. at 357.  He described his mood as anxious but appeared to be neat and well groomed, and acted appropriately.  *Id*. at 357.  Further, his thinking was coherent and goal directed.  *Id.*  Dr. Mintzer diagnosed Plaintiff with Axis I: PTSD and cannabis abuse; Axis III: HIV positive; Axis IV: lack of resolution of father's murder case, unemployment, HIV positive, level of psychological stressors severe; Axis V: global assessment of functioning 50.  *Id*. at 356.

Plaintiff was diagnosed with HIV on May 9, 2006, and was referred to Philadelphia FIGHT/Jonathan Lax Treatment Center for treatment ("FIGHT").  R. at 350; 384.  Plaintiff's primary care giver at FIGHT is Joseph Ondercin, a physician's assistant.  Def. Brief at A2.  Plaintiff was first seen at FIGHT on June 13, 2006.  R. at 398.  At the time, Plaintiff's CD4 count was 274.  *Id*. at 398.  When Plaintiff was seen at FIGHT on July 7, 2006, he weighed 156 lbs and his chief complaints were fatigue, constipation, anorexia, and decrease in vision.  *Id*. at 384.  When Plaintiff was seen in August 2006, his weight had increased to 160.25 lbs, and his CD4 count had risen to 446.  *Id*. at 391; 398.  On November 14, 2006, Plaintiff's weight had dropped to 149 lbs. and his chief complaints were diarrhea, fatigue, and mood swings.  *Id*. at 389.

On November 14, 2006, Ondercin completed a Human Immunodeficiency Virus Infection Medical Assessment Form. *Id*. at 409. He listed Plaintiff's June 13, 2006, CD4 count of 274 but did not mention that Plaintiff's CD4 count had increased to 446 by August 2006. R. at 398; 409. Ondercin also noted that Plaintiff suffers from anxiety, depression, and PTSD. *Id*. at 409. In his November 14, 2006 Assessment, Ondercin indicated that Plaintiff suffers from HIV Wasting Syndrome, which is characterized by "the involuntary weight loss of 10 percent or more of baseline [] and, in the absence of a concurrent illness that could explain the findings, involving: chronic diarrhea with 2 or more loose stools daily lasting for 1 month or longer; or chronic weakness and documented fever greater than 38ºC (100.4ºF) for the majority of 1 month or longer." *Id*. at 411. Ondercin then stated that Plaintiff has been suffering from "diarrhea, lasting for 1 month or longer, resistant to treatment, and requiring intravenous hydration, intravenous alimentation, or tube feeing." *Id*. Ondercin reported that Plaintiff suffers from fatigue on a daily basis, can sit continuously for only 30 minutes, and can stand continuously for only 20 minutes. *Id*. at 412-13. Ondercin concluded that Plaintiff can only stand and walk for 2 hours out of an 8 hour day and can only sit for 2 hours out of an eight hour day. *Id*. at 413. Ondercin also opined that in an average work day Plaintiff would require 6 unscheduled breaks of 45 minutes each. R. at 414. Ondercin stated that Plaintiff would be unable to perform jobs in which he was required to interact with the public, do routine repetitive tasks at a consistent pace, perform detailed or complicated tasks, meet strict deadlines, have close interaction with co-workers or supervisors, perform fast paced tasks, or have exposure to work hazards such as heights or moving machinery. *Id*. at 413.

Ondercin also completed a Mental Impairment Questionnaire for Plaintiff. *Id*. at 417-420. Ondercin diagnosed Plaintiff with Axis I: PTSD; Axis III: HIV; Axis IV: occupational

difficulties; Axis V: GAF of 55.  *Id*. at 417.  Ondercin prescribed Atripla, Zyprexa, and Zoloft

for Plaintiff's conditions.  *Id*.  He concluded that Plaintiff's prognosis for HIV is good and

Plaintiff's prognosis for PTSD is fair.  *Id*. at 418.  Ondercin found that Plaintiff's condition

causes moderate restriction of the activities of daily living, and marked difficulties in

maintaining social functioning, concentration, persistence, and pace.  R. at 419.  He also noted

that Plaintiff suffered one or two periods of decompression lasting at least two weeks within a

twelve month period.  *Id*. at 419.

## IV.        STANDARD OF REVIEW

The Commissioner's factual decisions must be upheld if they are supported by

"substantial evidence." 42 U.S.C. § 405(g); § 1383(c)(3) ("The final determination of the

Commissioner of Social Security. . . shall be subject to judicial review as provided in section

405(g) . . ."); *Williams v.  Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992).  "Substantial evidence"

means more than "a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  "It means such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion."  *Id*.  The inquiry is not

whether the reviewing court would have made the same determination, but rather whether the

Commissioner's conclusion was reasonable.  *Williams*, *supra*, 970 F.2d at 1182.  Substantial

evidence may be slightly less than a preponderance.  *Stunkard v. Sec'y of Health & Human

Servs.*, 841 F.2d 57, 59 (3d Cir. 1988).  Some types of evidence will not be "substantial."  For

example,

> '[a] single piece of evidence will not satisfy the substantiality test if the
> [Commissioner] ignores, or fails to resolve, a conflict created by
> countervailing evidence.  Nor is evidence substantial if it is overwhelmed by
> other evidence - particularly certain types of evidence (e.g. that offered by

treating physicians) - or if it really constitutes not evidence but mere
conclusion.'

*Wallace v.  Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting *Kent*

*v.  Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).

The evidence must be reviewed in its totality.  *See Daring v. Heckler*, 727 F.2d 64, 70 (3d

Cir. 1984).  In order to do so, "a court must 'take into account whatever in the record fairly

detracts from its weight.'" *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997)

(quoting *Willibanks v. Sec'y of Health & Human Servs.*, 847 F.2d 301, 303 (6th Cir.1988)

(internal citation omitted)).  The Commissioner has a duty to facilitate the court's review:

"[w]here the [Commissioner] is faced with conflicting evidence, he must adequately explain in

the record his reasons for rejecting or discrediting competent evidence."  *Ogden v. Bowen*, 677 F.

Supp. 273, 278 (M.D. Pa.  1987) (citing *Brewster v. Heckler*, 786 F.2d 581 (3d Cir. 1986)).

Access to the Commissioner's reasoning is essential to meaningful review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the
> weight he has given to obviously probative exhibits, to say that his decision is supported
> by substantial evidence approaches an abdication of the court's duty to scrutinize the
> record as a whole to determine whether the conclusions reached are rational.

*Gober v.  Matthews*, 574 F.2d 772, 776 (3d Cir. 1978) (quoting *Arnold v. Sec'y of Health, Educ.*

*& Welfare*, 567 F.2d 258 (4th Cir. 1977).  Nevertheless, the district court is not "empowered to

weigh the evidence or substitute its conclusions for those of the fact-finder."  *Williams*, *supra*,

970 F.2d at 1182.

### A.    The Record Must Provide Objective Medical Evidence

Under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq.* and 42 U.S.C.

§ 1381 *et seq.*, a claimant is required to provide objective medical evidence in order to prove his

disability.  42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a

disability unless he furnishes such medical and other evidence of the existence thereof as the Secretary may require."); 42 U.S.C. § 1382c(H)(i) ("In making determinations with respect to disability under this subchapter, the provisions of sections. . . 42 U.S.C. § 423(d)(5)(A) of this title shall apply in the same manner as they apply to determinations of disability under subchapter II of this chapter.").

A Plaintiff cannot prove that he is disabled based solely on his subjective complaints of pain and other symptoms.  *See Green v. Schweiker*, 749 F.2d 1066, 1069-70 (3d Cir. 1984) (emphasizing that subjective complaints of pain, without more, do not in themselves *constitute* disability.).  He must provide medical findings that show that he has a medically determinable impairment of such severity that he is unable to engage in any substantial gainful activity.  *See id.; see also* 42 U.S.C. § 423(d)(1)(A) (defining a disabled person as one who is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . ."); 42 U.S.C. § 1382c(a)(3)(A) (same).

Furthermore, a claimant's symptoms, "such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect . . . [one's] ability to do basic work activities unless 'medical signs' or laboratory findings show that a medically determinable impairment(s) is present."  20 C.F.R. § 404.1529(b); *see Hartranft v.  Apfel*, 181 F.3d 358, 362 (3d Cir.  1999) (rejecting claimant's argument that the ALJ failed to consider his subjective symptoms where the ALJ made findings that complaints of pain and symptoms were inconsistent with objective medical evidence and claimant's hearing testimony); *Williams*, *supra*, 970 F.2d at 1186 (denying claimant benefits where claimant failed to proffer medical findings or signs that he was unable to work).

B.    The Five-Step Analysis for Determining Disability

11

Social Security Regulations provide a five-step sequential analysis for evaluating whether a disability exists.  *See* 20 C.F.R. §§ 404.1520, 416.920.[1]  For the first two steps, the claimant must establish (1) that he has not engaged in "substantial gainful activity" since the onset of his alleged disability, and (2) that he suffers from a "severe impairment" or "combination of impairments."  20 C.F.R. §§ 404.1520(a)-(c), 416.920(a)-(c).  Failure to meet this burden automatically results in a denial of benefits.  *See Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).

If the claimant satisfies his initial burdens, the third step requires that he provide evidence that his impairment is equal to or exceeds one of the impairments listed in Appendix  1 of the Code of Federal Regulations ("Listing of Impairments").  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant can establish that his impairment equals or exceeds one of the listed impairments, he is presumed to be disabled and is automatically entitled to disability benefits. 20 C.F.R. §§ 404.1520(d), 416.920(d).  If he cannot so demonstrate, the analysis proceeds to steps four and five.

The fourth step of the analysis focuses on whether the claimant's "residual functional capacity" permits him to resume his previous employment.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).  "Residual functional capacity" is defined as "that which an individual is still able to do despite limitations caused by his or her impairments."  20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant is found to be capable of returning to his previous work, he is not "disabled" and

---

[1]  The regulations implementing the standard for obtaining disability insurance benefits, 42 U.S.C. § 401 *et seq.*, and those implementing the standard for supplemental security income, 42 U.S.C. § 1381 *et seq.* are the same in all relevant respects.  *See Sullivan  v. Zebley*, 493 U.S. 521, 526 n.3 (1990).

not entitled to disability benefits.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant is

unable to return to his previous work, the analysis proceeds to step five.

At step five, the burden shifts to the Commissioner to demonstrate that the claimant can

perform other substantial gainful work in the national economy, in light of his residual functional

capacity, age, education, and work experience.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).  The

Dictionary of Occupational Titles classifies the different levels of physical exertion, namely,

sedentary, light, medium, heavy, and very heavy, that could be associated with a job.  *See* 20

C.F.R. §§ 404.1567, 416.967.  Exertional limitations are those affecting the claimant's ability to

meet the strength demands of a job.  *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000).  All

impairments that do not affect the claimant's ability to meet the strength demands of a job are

classified as nonexertional.  *Id.*  If the Commissioner cannot satisfy this burden, the claimant

shall receive social security benefits.  *Yuckert,* 482 U.S. at 146-47 n.5.

## V.      THE ALJ'S DECISION

After reviewing the available evidence and considering Plaintiff's testimony, the ALJ

concluded that Plaintiff was not disabled.  The ALJ made the following findings:

### A.      Steps One and Two

At Step One the ALJ found, in order that the case may proceed on the merits, that

Plaintiff had not worked since the onset of his illness in 2002 despite evidence in the record to

the contrary.  R. at 16.  In making this finding, the ALJ noted that Plaintiff's earning records

show that he earned $16,556.73 in 2003, indicating some gainful employment, and that "it was

difficult to get the claimant to put his work record into a coherent picture" at the hearing.  *Id*.  At

Step Two, the ALJ found that Plaintiff suffers from two severe impairments pursuant to 20 CFR

404.1520(c) and 416.920(c), namely HIV and PTSD.  *Id*.

13

**B.    Step Three**

At Step Three, the ALJ concluded that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." *Id.*  Specifically, the ALJ rejected Ondercin's representation that Plaintiff suffers from HIV Wasting Syndrome and diarrhea. *Id*. at 17.  The ALJ noted that Plaintiff's medical records do not substantiate Ondercin's findings. *Id*.

The ALJ rejected Ondercin's findings related to Plaintiff's mental impairment.  He noted that Ondercin, who is not a doctor, has no special training in psychology.  R. At 17. Furthermore, Ondercin diagnosed Plaintiff with PTSD "by history" and did not conduct a full psychological evaluation. *Id*.  The ALJ also discounted Dr. Szteinbaum's findings because his office notes were made pursuant to Plaintiff's request for a "SSD evaluation" and "[t]he terminology of these notes were obviously made to conform to Listing 12.00." *Id*.  The ALJ also found Dr. Szteinbaum's notes conclusory and unsupported by facts. *Id*.

**C.    Step Four**

At Step Four, the ALJ determined that Plaintiff has the residual functional capacity to perform unskilled light exertion work. *Id*.  The ALJ considered all of Plaintiff's symptoms and the extent to which the symptoms can be accepted as conforming to the objective medical evidence. *Id*.  The ALJ also considered the opinion evidence offered by Plaintiff.  R. at 17.

The ALJ followed a two step process to determine the type of work Plaintiff is capable of performing given his ailments.  First, the ALJ "determined whether [Plaintiff has] an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the [Plaintiff's] pain or other symptoms" *Id*.  Second, the ALJ evaluated the

intensity, persistence, and limiting effects of the Plaintiff's symptoms in order to determine the extent to which they limit the Plaintiff's ability to work.  *Id*.  The ALJ noted that when statements about the intensity, persistence, or functionally limiting effects of an illness are not supported by the objective medical evidence, he must make credibility findings based upon his review of the entire case record.  *Id*.  When a plaintiff's symptoms indicate a greater level of impairment than would be expected based on the objective medical evidence, the ALJ must consider other factors, including the plaintiff's daily activities, the location, duration, frequency, and intensity of the symptoms, circumstances that precipitate or aggravate the plaintiff's symptoms, medications, other treatments the plaintiff receives, other strategies the plaintiff employs to cope with the illness, and any other factors concerning the plaintiff's functional limitations or restrictions, when determining a plaintiff's residual functional capacity.  *Id*. at 17-18.

After considering all the evidence in the record, the ALJ concluded that Plaintiff's medically determinable impairments can be expected to produce the alleged symptoms, but that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were not credible.  *Id*. at 18.  The ALJ found Plaintiff's representation of the effects of his HIV infection and PTSD overstated because Ondercin's assertion that Plaintiff suffers from HIV Wasting Syndrome is not supported by any of the medical evidence.  R. at 18-19.  The ALJ also noted that Plaintiff's condition had improved from the time he first sought treatment for HIV in June 2006.  *Id*. at 19-20.

The ALJ gave great weight to Dr. Shaw's assessment of Plaintiff's mental functioning because the doctor supported his conclusions with facts specific to Plaintiff's case.  *Id*. at 19.  Dr. Shaw concluded that Plaintiff can follow instructions and do simple calculations.  *Id.*  Further,

15

Dr. Shaw stated that Plaintiff was able to persist at tasks asked of him as part of the assessment. *Id.* Dr. Shaw also observed that despite Plaintiff's reported social phobia and anxiety he is able to attend church three times per week. *Id.*

Finally, the ALJ discounted Plaintiff's testimony because he did not find Plaintiff credible. R. at 20. Specifically, the ALJ found that inconsistencies in Plaintiff's testimony weakened his credibility. *Id.* For example, Plaintiff testified that he has not driven in three or four years, yet told a medical provider that he does not have transportation "unless he borrows his stepbrother's car." *Id.* at 19. Additionally, Plaintiff advised Dr. Mintzer that he was using marijuana daily about seven months prior to the hearing in this case, but testified at the hearing that he had not used marijuana in one-and-a-half years. *Id.* at 19-20.

Because Plaintiff can only do light exertion unskilled work, he cannot return to his prior relevant work. *Id.* at 20.

### D.    Step Five

At Step Five, the ALJ concluded that unskilled light exertion jobs[2] Plaintiff is able to perform exist in significant numbers in the national economy. *Id.* at 21. The ALJ based this conclusion on medical-vocational Rules 201.29 and 202.22, as well as on Social Security Rulings ("SSR") 83-11, 83-12, and 83-14. R. at 21.

## VI.    DISCUSSION

---

[2] "Unskilled work may be performed by individuals with no work skills or no work experience." SSR 83-10. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. 404.1567; 416.967.

Plaintiff raises two issues in his appeal to this Court.  Pl. Br. at III.  First, Plaintiff argues

that the ALJ failed to properly determine Plaintiff's residual functional capacity, and erred by

determining that there are jobs in the national economy that Plaintiff is capable of performing

without hearing testimony of a vocational expert.  *Id.*  Second, Plaintiff argues that the ALJ

failed to properly weigh the reports of Ondercin, the physician's assistant treating Plaintiff.  *Id.*

   **A.   The ALJ Properly Determined Plaintiff's Residual Functional Capacity But Erred When Determining That There Are Significant Jobs In The National Economy That Plaintiff Can Perform.**

The Code of Federal Regulations define residual functional capacity as "that which an

individual is still able to do despite limitations caused by his or her impairments."  20 C.F.R. §§

404.1520(e), 416.920(e).  An ALJ's determination of residual functional capacity must be

supported by substantial evidence.  *Williams*, *supra*, 970 F.2d at1182.  Substantial evidence is

more than a scintilla but may be less than a preponderance.  *Richardson*, *supra*, 402 U.S. at 401;

*Stunkard*, *supra*, 841 F.2d at 59.  Substantial evidence means "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Stunkard*, *supra*, 841 F.2d

at 59.  The inquiry is not whether the reviewing court would have made the same determination,

but rather whether the Commissioner's conclusion was reasonable.  *Williams*, *supra*, 970 F.2d at

1182.

In this case, the ALJ's determination that Plaintiff is able to perform unskilled light

exertion work is supported by substantial evidence in the record.  The ALJ found that Plaintiff's

HIV infection does not render him totally disabled.  The ALJ noted that Plaintiff's HIV infection

had improved from the time of his initial diagnosis.  R. at 18-20.  Further, the ALJ observed that

the medical evidence shows Plaintiff does not suffer from HIV Wasting Syndrome as asserted by

Ondercin.  *Id*. at 18-19.  The ALJ also found that Plaintiff's PTSD symptoms do not render him

totally disabled.  *Id*. at 19-20.  The ALJ primarily relied upon the evidence provided by Dr.

Shaw.  *Id.*  Dr. Shaw evaluated Plaintiff in 2006 and found that Plaintiff's ability to "understand,

remember and execute short and detailed instructions was unimpaired."  *Id.* at 19.  Dr. Shaw also

opined that Plaintiff's PTSD only had a moderate impact on his ability to interact appropriately

with supervisors and co-workers, and on his ability to manage work related stress.  *Id.* at 19.  Dr.

Shaw's conclusions are not contradicted by other credible evidence in the record, the ALJ's

conclusion that Plaintiff is not disabled was reasonable in light of Dr. Shaw's report, and this

Court shall not disturb the ALJ's findings.

When a claimant suffers from exertional and nonexertional impairments the

Commissioner is not permitted to "determine that a claimant's nonexertional impairments do not

significantly erode his occupational base under the medical-vocational guidelines" unless

additional vocational evidence is taken or notice is provided to the claimant that the

Commissioner intends to take official notice of the fact that claimant's nonexertional impairment

does not significantly erode his occupational base.  *Sykes*, *supra*, 228 F.3d at 261.  The

Commissioner is not permitted to meet his burden by relying exclusively on the grids when

exertional and nonexertional impairments are present, however, the Commissioner need not

provide the testimony of a vocational expert in every case.  *Id.* at 270.  The Commissioner may

instead rely upon rulemaking and SSRs when a particular claimant's exertional and

nonexertional impairments do not require a case-by-case determination.  *Id.*; *see Allen v.

Barnhart*, 417 F.3d 396, 398 (3d Cir. 2005).   Further, when the Commissioner intends to "rely

on rules as a substitute for individualized determination, and thus relieve the agency from the

burden of producing evidence, [the court] thinks advance notice should be given."  *Allen*, *supra*,

417 F.3d at 407.  Notice is necessary in order to give the claimant an opportunity to "attempt to undercut the Commissioner's proffer."  *Id.* at 408.

When an ALJ uses a SSR to determine that a nonexertional impairment does not significantly erode a claimant's occupational base, "it must be crystal-clear that the SSR is probative as to the way in which the nonexertional limitations impact the ability to work, and thus, the occupational base." *Id*. at 407.  An ALJ is required to note how the SSR relied upon is relevant and controlling.  *Id.*  A conclusory reference to a SSR will not suffice.  *See id.* at 404.

In the case at bar, the ALJ used the medical-vocational rules as a framework for decision making when he concluded that unskilled, light exertion jobs exist in significant numbers in the national economy that Plaintiff can perform.  R. at 21.  In addition to the medical-vocational rules, the ALJ cites SSR 83-11, SSR 83-12, and SSR 83-14 as support for his conclusion.  *Id.* However, he does not explain, even in the most cursory manner, how the cited SSRs apply to Plaintiff's case.  Under Third Circuit precedent, an ALJ who uses SSRs at step five must be "crystal-clear" that the SSRs upon which he relies are probative under the circumstances.  *Allen*, *supra*, 417 F.3d at 407.  Furthermore, the Plaintiff did not receive notice that the Commissioner would rely upon SSR 83-11, SSR 83-12, and SSR 83-14 to meet its burden at step five.  Upon remand, the ALJ is instructed to explain how the cited SSRs are relevant and probative in this case.

### B.    The ALJ Afforded Ondercin's Reports Proper Weight.

The ALJ did not err when he discounted the reports submitted by physician's assistant Joseph Ondercin.  Only acceptable medical sources may provide evidence to establish disablity.  20 C.F.R. § 404.1513; 416.913.  Acceptable medical sources are limited to

(1) Licensed physicians (medical or osteopathic doctors);

(2) Licensed or certified psychologists. Included are school psychologists, or other licensed or certified individuals with other titles who perform the same function as a school psychologist in a school setting, for purposes of establishing mental retardation, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrists, for purposes of establishing visual disorders only (except, in the U.S. Virgin Islands, licensed optometrists, for the measurement of visual acuity and visual fields only);

(4) Licensed podiatrists, for purposes of establishing impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or the foot and ankle; and

(5) Qualified speech-language pathologists, for purposes of establishing speech or language impairments only. For this source, "qualified" means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence from the American Speech–Language–Hearing Association.

*Id.*

In addition to evidence provided by acceptable medical sources, the SSA may consider evidence from other sources, including from a physician's assistant, when making a disability determination. *Id.* However, evidence from a physician's assistant alone is not sufficient to prove a disability. *See Id.*

The ALJ discounted Ondercin's reports because as a physician's assistant he is not an acceptable medical source, and because Ondercin's reports are not supported by the other medical evidence contained in the record. Ondercin's Human Immunodeficiency Virus Infection Medical Assessment reports that on June 13, 2006, Plaintiff's CD4 count was 274 but fails to note that by August 26, 2006, Plaintiff's CD4 count had increased to 446. R. at 398; 409. Further, Ondercin's report states that Plaintiff suffers from HIV Wasting Syndrome and diarrhea

requiring intravenous hydration, intravenous alimentation, or tube feeding. *Id.* at 411. A review of Plaintiff's medical records shows that he does not meet the criteria for HIV Wasting Syndrome. Plaintiff has not involuntarily lost ten percent or more of his body weight, even when using his most favorable weights. Furthermore, nothing in Plaintiff's medical records indicate that he has required intravenous treatment or tube feeding for diarrhea. An ALJ's credibility determination that is consistent with the evidence will not be disturbed by this Court unless it is "patently wrong." *Cavaliero v. Astrue*, 2009 WL 1684435, *11 (W.D. Pa. June 16, 2009) (citing *Schmidt v. Barnhart,* 395 F.3d 737, 746-747 (7th Cir.2005)). In this case, the ALJ's decision to give little weight to evidence provided by Ondercin is consistent with the evidence and not "patently wrong." Therefore, this Court must conclude that the ALJ afforded proper weight to Ondercin's reports.

## VII.    CONCLUSION

For the reasons above, the ALJ's decision is affirmed in part and remanded for further findings consistent with this opinion. An appropriate Order accompanies this opinion.


/s/ JOEL A. PISANO
United States District Judge


Dated: February 3, 2010